UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ANTHONY BERNARDUCCI, )<br>)<br>      Plaintiff, )<br>)<br>v. )<br>)<br>FIELDING'S OIL CO., INC., )<br>)<br>      Defendant ) | Case No. _____ |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Anthony Bernarducci, by and through undersigned counsel, hereby complains against Defendant Fielding's Oil Co., Inc. as follows:

### INTRODUCTION

1. This is an action for violation of the Federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), the Maine Family Medical Leave Requirements Law, 26 M.R.S. § 8433 *et seq*. ("Maine FMLA"), the Americans with Disabilities Act and amendments thereto, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the Maine Human Rights Act, 5 M.R.S. § 4571 *et seq*. ("MHRA").

2. This case challenges Defendant's: (1) interference with Plaintiff's rights under the FMLA and Maine FMLA and discrimination against him for exercising those rights; and (2) disability discrimination against Plaintiff, failure to accommodate him, and retaliation in violation of the ADA and MHRA.

### THE PARTIES

3. Plaintiff Anthony Bernarducci ("Bernarducci") is an individual residing in the Town of Farmingdale, County of Kennebec, and State of Maine.

1

4. Defendant Fielding's Oil Co., Inc. ("Fielding's") is a Maine-based oil and propane gas company headquartered in Scarborough, Maine.

5. From January 26, 2018 to June 3, 2019, Fielding's employed Bernarducci as an apprentice oil burner technician earning $17.00 per hour.

6. Fielding's has employed more than 50 employees for each of 20 or more calendar weeks for the past two years, with employees located in three separate offices (Scarborough, Augusta, and Lewiston/Auburn), all within 75 miles of each other.

## JURISDICTION AND VENUE

7. Prior to filing this Complaint, Bernarducci filed a charge of discrimination with the Maine Human Rights Commission and the EEOC and received a notice of right to sue letter pursuant to 5 M.R.S.A. § 4612, sub-§6 and 4622, sub-§1, ¶ C on or about October 21, 2020.

8. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in the County of Kennebec and State of Maine.

9. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## STATEMENT OF FACTS

10. Fielding's hired Bernarducci in January of 2018 to work as an apprentice oil burner technician.

11. Bernarducci reported directly to Paul Martin ("Martin").

12. As an apprentice, Bernarducci was only allowed to perform routine cleaning and minor repairs on oil burners. At all times during Bernarducci's apprenticeship, Defendant's more experienced technicians and journeymen were supposed to supervise his work. Any repairs,

installation, or servicing of oil burners were done by supervising journeymen while Bernarducci was in training.

13. Because Bernarducci was an apprentice when first hired by Fielding's, any performance problems or customer complaints about his work during this training period were attributable to the technicians supervising and training Bernarducci.

14. The statutory requirements for obtaining a journeyman's license are found at 32 M.R.S. § 18133. The requirements include either one year of licensed practical experience as an apprentice oil burner technician, or six months of licensed practical experience along with technical courses. In addition to the qualifications set forth by statute, Bernarducci was required to pass an examination approved by the Maine Fuel Board.

15. Bernarducci's first attempt at the journeyman's exam in 2018 was unsuccessful and he failed by two points. Bernarducci's supervisor, Paul Martin, told him not to worry about failing. Martin indicated that many of Defendant's technicians have had to take the exam two or three times before they pass.

16. On November 30, 2018, Bernarducci arrived at a customer's home with a supervising technician to perform work on the customer's boiler. He returned to the truck to retrieve some tools and slipped on the homeowner's icy driveway.

17. Bernarducci fell hard and heard a snap when he landed on his right leg. He felt extreme, immediate pain.

18. The homeowner called an ambulance for Bernarducci because he could not stand up.

19. Bernarducci called his supervisor, Paul Martin, as he lay on the ground in pain. Martin did not want Bernarducci to incur the expense of an ambulance, so he sent another employee, Carl Larabee, to pick Bernarducci up and drive him to the hospital.

20. Bernarducci went to the emergency room at MaineGeneral Medical Center. Imaging of his leg and ankle revealed a right distal fibula fracture.

21. The hospital released Bernarducci with crutches and instructions not to work at all for three days, then not to work on his feet until cleared by an orthopedic specialist.

22. Fielding's filled out and submitted a first report of injury form to the Maine Worker's Compensation Board on December 3, 2018.

23. Bernarducci followed up with Ocean Dunton, PA-C from MaineGeneral Orthopedics on December 6, 2018. PA-C Dunton filled out an M-1 report for worker's compensation and told Bernarducci he should stay out of work completely for 1-2 months.

24. Fearing retaliation from Fielding's, Bernarducci asked PA-C Dunton if he could release him to return to work light duty.

25. The M-1 report filled out by PA-C Dunton on December 6, 2018 indicated that Bernarducci's treatment for his work-related injury would continue for 3-6 months. He released Bernarducci to return to work with restrictions to perform desk work only and elevate his leg constantly.

26. At first, Martin was accommodating of Bernarducci's need to take time off for his work-related injury. Martin was supportive of Bernarducci's return to work with light duty restrictions on December 6, 2018.

27. However, Bernarducci's job did not involve desk work.

28. Bernarducci's attempt to return to work with restrictions was unsuccessful. He was supposed to elevate his leg continuously, but this was not possible when he returned to Fielding's in the Augusta office.

29. Bernarducci experienced significant pain any time his broken leg was not elevated, and therefore he returned to MaineGeneral Orthopedics on December 12, 2018.

30. During the appointment on December 12, 2018, PA-C Dunton told Bernarducci that he should remain out of work completely for at least two weeks.

31. PA-C Dunton wrote on Bernarducci's updated M-1 report from December 12, 2018: "This is a modification to M-1 12/6. Pt. attempted to return to work but driving is unsafe and he is not able to elevate the leg appropriately while at work." PA-C Dunton checked off the "no work capacity" box and planned to see Bernarducci again on December 26, 2018.

32. On December 26, 2018, Bernarducci returned to PA-C Dunton. The M-1 from this visit took Bernarducci out of work, with no work capacity, for approximately 3-4 months.

33. Upon information and belief, Defendant refused to accommodate PA-C Dunton's order that Bernarducci remain out of work for 3-4 months. Therefore, Defendant contacted Bernarducci's medical providers to demand that he be released to return to work with modified/light duty restrictions.

34. Upon information and belief, because Fielding's and/or MEMIC demanded that Bernarducci be released for light duty work, PA-C Dunton changed the M-1 dated December 26, 2018 to reflect that Plaintiff could return to modified duty. PA-C Dunton ordered "desk work only" and that Bernarducci elevate his right leg often. PA-C Dunton also noted that Bernarducci required transportation to and from work because he was unable to drive.

35. The modified M-1 from December 26, 2018 was faxed to Fielding's on January 9, 2019. Bernarducci got a call saying that he had been released to return to work, which he did in January.

36. Bernarducci returned to PA-C Dunton on January 23, 2019. The M-1 from this appointment ordered "light duty desk work" and said that Bernarducci was "ok to drive."

37. By the end of January 2019, Martin was growing increasing angry about Bernarducci's request and need for light duty work restrictions.

38. PA-C Dunton had originally ordered that Bernarducci remain out of work completely until roughly March of 2019. By the end of January 2019, Bernarducci was eligible for FMLA leave.

39. Fielding's never provided Bernarducci with notice of his rights under the FMLA after he became eligible for leave, even though PA-C Dunton had originally ordered that he remain out of work until March 2019.

40. Rather than letting Bernarducci go out on a protected FMLA leave while his broken leg healed, Martin forced Bernarducci to sit in the Augusta office without any work to do. Bernarducci was unable to elevate his leg or perform "desk work."

41. The customer service representatives in the Augusta office repeatedly commented that Bernarducci should not be at work if he could not perform any job functions due to his broken leg.

42. On January 28, 2019, the Augusta office flooded and soaked the carpet, causing a horrible smell. The Augusta office was where Fielding's forced Bernarducci to report to work and sit at a desk all day with nothing to do instead of taking an FMLA leave. Due to potential human

health hazards from the leak, Fielding's sent the Augusta office employees home with pay for the day.

43. Bernarducci noticed that he was not paid for work that day like the other Augusta office employees who had been sent home. He texted Martin to ask why he was not paid.

44. Martin responded that Bernarducci was not paid for the day on January 28, 2019 because he did not tell Martin he was going home. This excuse made no sense because Martin knew that all office employees in Augusta had been sent home for the day because of the sewage.

45. Martin then agreed to pay Bernarducci like the other employees, but Martin told him: "From now on, you check with me. If you have a doctor's appointment, you check with me. When you go to a doctor's appointment, you check with me. When you get back from a doctor's appointment, you check with me. Understood?"

46. Bernarducci understood Martin's comments about doctor's appointments to be retaliatory and hostile because he was beginning a physical therapy program for his broken leg.

47. Martin became increasingly hostile the longer it took Bernarducci's broken leg to heal. At one point, after Bernarducci was qualified to take FMLA leave for his serious health condition, Martin asked Bernarducci: "How long is this bullshit going to go on?" The "bullshit" Martin referred to was Bernarducci's broken leg.

48. Martin also screamed at Bernarducci because he was not able to walk up or down stairs on service calls. Bernarducci responded, "I'm sorry my bone won't heal fast enough."

49. On March 6, 2019, Bernarducci returned to PA-C Dunton. The M-1 for Bernarducci's leg on that date stated: "No change in previous restrictions." Bernarducci also saw PA-C Kim Perkins at MaineGeneral Orthopedics on March 6, 2019 for a "low back strain." She

noted that Bernarducci's back pain was work related and recommended physical therapy as well as an MRI.

50. On March 15, 2019, David Fielding received an email from Linda Allred, a nurse case manager with MEMIC, discussing Bernarducci's serious health condition.

51. Nurse Allred informed David Fielding that Bernarducci had been seen for both his ankle and low back pain on March 6, 2019. She indicated that the back pain may have been related to the original fall on November 30, 2018. Nurse Allred said that Bernarducci's ankle "continues to slowly heal" and he had started physical therapy.

52. Even after this correspondence with MEMIC, Defendant did not provide Bernarducci with any notice of his right to take FMLA leave, either on a full or an intermittent basis.

53. In late March of 2019, a technician named Ben brought Bernarducci's personal belongings and tools from his work van into the Augusta office.

54. Bernarducci called Martin to ask why his personal belongings had been removed from his work van. Martin responded: "That truck has just been sitting there not making me any money. I need to put someone in it who is actually going to work for me instead of sitting around collecting a paycheck."

55. Bernarducci did not get all of his tools back when Defendant took his van away. He lost several hundred dollars' worth of tools. When Bernarducci told Martin he was missing tools, Martin said to figure it out himself and hung up on Bernarducci.

56. Between January of 2019 and the time that Bernarducci was released to return to work full duty on May 29, 2019, Martin continued to badmouth Bernarducci and discuss his medical condition with other employees.

57. Upon information and belief, Martin told Phil in the Scarborough office that he did not like Bernarducci.

58. Upon information and belief, Martin told other employees that as soon as Bernarducci was released back to work full duty, he would be terminated.

59. Upon information and belief, Defendant or one of its agents contacted MaineGeneral Orthopedics and demanded that Ocean Dunton, PA-C release Bernarducci back to work without restrictions.

60. On April 12, 2019, PA-C Dunton amended the M-1 from March 6, 2019 to allow for increased work capacity, including riding in a van as a passenger, going up and down stairs once per customer visit, and alternating light duty with desk work. Bernarducci was still restricted from carrying any heavy equipment or tools or performing any full duty work until at least May 22, 2019.

61. Rather than providing Bernarducci with notice of his right to take FMLA leave, David Fielding again spoke with Nurse Allred from MEMIC on April 16, 2019 about "giving Anthony more work capacity." Nurse Allred emailed Fielding that Bernarducci had "asked that he not start these advanced duties until Monday 4/22. It also might be beneficial to alternate days in the office, with days out in the field initially so Anthony can get used to the added activities."

62. MEMIC called Bernarducci and informed him that they spoke with PA-C Dunton at Fielding's request to get him released to work full duty. At the time, Bernarducci was still attending physical therapy to strengthen his ankle, which was still very swollen.

63. On April 22, 2019, Martin called Bernarducci and said that he would be riding with a technician named Ben tomorrow. Martin said: "This has been going on long enough and you

need to get back to work!" Bernarducci tried to tell Martin that he could not make his leg heal any faster.

64. During this conversation, Martin cut him off and asked if Bernarducci had taken his journeyman's exam a second time. Bernarducci explained that he had not taken the exam in February or March because it was winter, and the long trip from the parking lot into the building at the exam site was too difficult on crutches. Martin told Bernarducci he needed to take the exam and get his license ASAP because his job depended on it.

65. On May 2, 2019, Bernarducci arrived at the Lewiston office with a technician named Chris. A dispatcher named Eric said that Bernarducci was "milking" his injury. Bernarducci had never told Eric about his injury and there was no reason why Eric would have access to his confidential, protected health information.

66. On May 14, 2019, Bernarducci passed his Journeyman's exam.

67. On May 15, 2019, Bernarducci met Chris at the Augusta office. When Eric from dispatch arrived with some office supplies, a customer service representative said the supplies should be brought "out back." Bernarducci was not able to carry the boxes because of his broken leg. Eric mocked Bernarducci and asked, "seriously?" Eric then told Bernarducci, "don't worry, the girls will get it."

68. On May 20, 2019, Bernarducci forwarded Martin an email from the Maine Fuel Board, attaching an affidavit that Martin needed to fill out as his supervising master technician. Martin did not respond, but instead delayed signing and returning Bernarducci's affidavit for almost a year.

69. On two separate dates in May of 2019, Bernarducci was forced to reschedule his physical therapy appointments due to his work schedule. During the month of May 2019,

Defendant interfered with Bernarducci's physical therapy appointments without providing him any notice of his rights to intermittent leave under the FMLA.

70. In late May 2019, Bernarducci's ankle was still sore and swollen and he continued to need physical therapy.

71. On May 29, 2019, PA-C Dunton released Bernarducci to return to work full duty.

72. On June 3, 2019, Defendant terminated Bernarducci's employment.

73. Between January 26, 2019 and Bernarducci's termination on June 3, 2019, Fielding's never informed Bernarducci of his rights under the FMLA.

74. The stated reason for Bernarducci's termination was a layoff.

75. After his termination, Bernarducci's former co-worker, Kim Maddocks, informed him that she had overheard Martin talking to a field tech about him. Martin said that Bernarducci's termination had been "in the works for a while now," and Defendant was just "waiting for the right time" to fire him.

76. Another employee overheard Martin saying that as soon as Bernarducci was cleared to return to work, he would be fired.

77. Bernarducci's termination was not a layoff because at least a dozen other employees had been laid off, fired, or quit in the months leading up to June 2019. In addition, right after Bernarducci's termination, Fielding's advertised for the same position. Instead, Bernarducci's termination was the result of the discriminatory and retaliatory motives alleged herein.

78. Defendant's practice is to lay off fuel truck drivers, not technicians, in the spring.

79. After Defendant terminated Bernarducci, he continued asking Martin to fill out the affidavit about the hours of supervised training that he had received. Without this affidavit filled

out by Martin, Bernarducci could not obtain his journeyman's license. Martin delayed filling out the affidavit for nearly a year, until he was contacted by the Maine Fuel Board and Bernarducci was ready to file a formal complaint. Martin's intentional delay in filling out the affidavit caused Bernarducci to lose income because he could not obtain his journeyman's license.

80. Fielding's agents and representatives knowingly and willfully retaliated and discriminated against Bernarducci in violation of State and Federal law.

### COUNT I – FMLA INTERFERENCE
### (29 U.S.C. § 2615(a)(1))

81. Plaintiff repeats the allegations contained in Paragraphs 1 through 80 as if fully stated herein.

82. As of January 26, 2019, Bernarducci was eligible and qualified for leave under the FMLA.

83. Bernarducci's broken leg constituted a serious health condition within the meaning of the FMLA.

84. Bernarducci provided Defendant with appropriate notice of his need to take full and/or intermittent leave under the FMLA. Between January 2019 and the date of his termination in June, Bernarducci requested both a medical leave of absence and intermittent leave to attend physical therapy and doctor's appointments.

85. Defendant interfered with Bernarducci's substantive rights under the FMLA by denying, discouraging, or restraining his request for a full medical leave of absence. Regarding intermittent leave, Defendant harassed, mocked, and criticized Bernarducci when he needed time off for medical appointments and physical therapy.

86. Defendant further interfered with Bernarducci's rights under the FMLA by failing to provide him with any notice of his right to take full or intermittent leave.

87. As a result of Defendant's FMLA interference, Bernarducci has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

88. Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Anthony Bernarducci requests that the Court award him damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT II – FMLA RETALIATION
### (29 U.S.C. § 2615(a)(2))

89. Plaintiff repeats the allegations contained in Paragraphs 1 through 88 as if fully stated herein.

90. In addition to the allegations set forth above, Defendant retaliated against Bernarducci for taking full and/or intermittent FMLA-protected leave due to his broken leg.

91. Defendant's termination of Bernarducci's employment in June of 2019 was motivated by and the result of discriminatory and/or retaliatory animus toward him for having exercised his rights under the FMLA to take intermittent medical leave for medical and physical therapy appointments.

92. As a result of Defendant's FMLA retaliation, Bernarducci has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

93. Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Anthony Bernarducci requests that the Court award him damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT III – VIOLATION OF THE MAINE FMLA
### (26 M.R.S. § 847)

94. Plaintiff repeats the allegations contained in Paragraphs 1 through 93 as if fully stated herein.

95. As set forth more fully in Counts I and II above, Defendant's conduct amounts to a violation of the Maine FMLA.

96. As a result of Defendant's violation of the Maine FLMA, Bernarducci has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

97. Defendant's violation of the Maine FMLA was willful, justifying an award of liquidated damages under the Maine FMLA. Alternatively, Plaintiff is entitled to liquidated damages of $100 per day beginning on the date that Bernarducci became eligible and qualified for FLMA leave, January 26, 2019.

WHEREFORE, Plaintiff Anthony Bernarducci requests that the Court award him damages for Defendant's violation of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## **COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA**
### **(29 U.S.C. § 621 *et seq*.)**

98. Plaintiff repeats the allegations contained in Paragraphs 1 through 97 as if fully stated herein.

99. Bernarducci was a qualified individual with a disability within the meaning of the ADA.

100. Defendant regarded Bernarducci as having a disability that substantially impaired his ability to work, walk, and drive a truck.

101. Alternatively, Bernarducci was disabled because he had a substantial impairment in his ability to work, walk, and drive a truck that lasted more than 6 months in duration.

102. Bernarducci had a record of a disability.

103. Even though Defendant regarded Bernarducci as having a disability that required treatment and time off from work, and Bernarducci did have a disability that required accommodation, Defendant failed to engage in the interactive process with Bernarducci.

104. Defendant failed to accommodate Bernarducci's perceived or actual disability, in violation of the ADA.

105. Defendant discriminated against Bernarducci because of his perceived or actual disability.

106. Defendant further discriminated against Plaintiff on the basis of his perceived or actual disability within the meaning of 42 U.S.C. § 12112(b), by violating the provisions of the ADA that require employers to keep medical information confidential. *See* 29 C.F.R. § 1630.14.

107. As a result of Defendant's disability discrimination and willful violation of the ADA, Bernarducci has suffered and is entitled to damages, including but not limited to: lost wages

and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

108. Defendant recklessly, knowingly, and/or willfully retaliated against Bernarducci in violation of the ADA and therefore Plaintiff is entitled to liquidated and punitive damages.

WHEREFORE, Plaintiff Anthony Bernarducci requests that the Court award him damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

### COUNT V – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
**(5 M.R.S. § 4571 *et seq*.)**

109. Plaintiff repeats the allegations contained in Paragraphs 1 through 108 as if fully stated herein.

110. For the reasons set forth in Count IV above, unlawful disability discrimination and retaliation against Plaintiff have taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Anthony Bernarducci requests that the Court award him damages for Defendant's violation of the Maine Human Rights Act, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

### JURY TRIAL DEMAND

Plaintiff Anthony Bernarducci hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: December 9, 2020  /s/ *Laura H. White*

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com


/s/ *Danielle Quinlan*

Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
dquinlan@whiteandquinlan.com